JOHNSON & JOHNSON, Plaintiff,

v.

W. L. GORE & ASSOCIATES, INC., Defendant.

Civ. A. No. 4334.

United States District Court, D. Delaware.

July 28, 1977.

Don K. Harness, John A. Blair, and Robert L. Boynton, of Harness, Dickey & Pierce, Birmingham, Mich., for plaintiff; Thomas S. Lodge, of Connolly, Bove & Lodge, Wilmington, Del., of counsel.

Marcus B. Finnegan, Brian G. Brunsvold, and Bruce C. Zotter, of Finnegan, Henderson, Farabow & Garrett, Washington, D.C., E. A. Uebler, of W. L. Gore & Associates, Inc., Newark, Del., for defendant; C. Walter Mortenson, Wilmington, Del., of counsel.

CALEB M. WRIGHT, Senior District Judge.

Plaintiff, Johnson & Johnson ("J & J") has brought an action against W. L. Gore & Associates, Inc. ("Gore"), charging infringement of U.S. Patent No. 3,002,770 covering a "Threaded Joint with Lubricating and Sealing Ribbon Interposed Between the Threads". In its answer, defendant denies infringement, and asserts three grounds of invalidity with respect to the patent in suit: lack of inventorship under § 102(f), obviousness under § 103, and anticipation under § 102. In addition, defendant urges that the failure of plaintiff to reveal certain prior art to the Patent Office during prosecution of the patent application constitutes fraud which renders the patent unenforceable. Finally, defendant argues that plaintiff is barred from bringing the present suit on the grounds of laches and estoppel.[1]

---

1. By order of June 20, 1974, the Court granted defendant leave to file an additional counterclaim alleging fraudulent misrepresentations by plaintiff with respect to inventorship, and certain violations by plaintiff of the antitrust laws. Discovery and trial with respect to the antitrust issues have been stayed pending decision on the issues of patent validity, enforceability, in-

Trial was had on the patent issues from January 27 to February 3, 1977. The following constitutes this Court's findings of facts and conclusions of law as provided by Rule 52, Fed.R.Civ.P.

## I. *THE PATENT IN SUIT*

The patent in suit claims a threaded pipe joint sealed by a tape of unsintered polytetrafluoroethylene ("UPTFE" or "unsintered PTFE") tape.[2] It was issued to J & J as assignee of the named inventors, James A. Chesnut and Joseph D. Singalewitch, on October 3, 1961, pursuant to an application serial number 767,116, filed October 14, 1958, and a continuation-in-part application, serial number 849,536, filed October 29, 1959 while application number 767,116 was pending.

All three claims of the patent are at issue here. Claim 1, which discloses most of the essential elements of the invention, recites:

"1. A threaded joint comprising a male fitting having continuous male threads, a female fitting having continuous female threads adapted to mate with the threads on the male fitting, and a preformed transversely stretchable and compressible lubricating and sealing ribbon having a relatively low coefficient of friction and a high degree of lubricity wrapped circumferentially around the threads of the male fitting for at least one turn there around with the ends of the ribbon overlapped one upon the other by an appreciable amount, said overlapping end portions of the ribbon adhering to one another when pressed into contact by hand, said ribbon prior to turning the male and female fittings together being in the form of a flat coherent unsintered polytetrafluoroethylene film having a specific gravity in the range of about 1.2–1.8 and being about 1 to 20 mils in thickness, the male and female fittings being turned together with the ribbon compressed and conforming substantially with the shape of the space between the male and female threads and defined by said threads when the threads are turned together with the ribbon between them, the ribbon remaining in substantially continuous film form on the faces of the threads between the tips of said threads and providing the anti-binding and sealing barrier between the threads and a lubricated surface for turning the fittings with respect to one another at any time during the life of the joint, whereby there is provided a joint possessing the following properties:

(a) leakproof tightness at low torque,

(b) retention of leakproof tightness for the life of the joint, and

(c) ease of opening the joint during its life.

Claims 2 and 3 relate to the reusability feature of the completed joint.[3]

As is described by the specification, UPTFE tape is made by extruding and then calendaring a mixture of very fine, approximately spherical particles of UPTFE and a lubricant such as mineral spirits. After extrusion, the lubricant is evaporated, leav-

fringement and inventorship. Discovery and trial with respect to damages in the patent infringement action were also deferred by agreement of the parties until after decision on the issue of liability for patent infringement. At the pre-trial conference, the Court ordered that trial also be stayed as to general allegations of patent misuse. Transcript of Pre-trial Conference, January 18, 1977, p. 24.

2. Polytetrafluoroethylene ("PTFE") is also widely known by its du Pont trademark, "Teflon". It is available in sintered and unsintered form. The sintering process involves heating the PTFE material above its crystalline melt point, thereby destroying the crystalline configuration of the material.

3. Claim 2 provides:

A threaded joint according to Claim 1 wherein the joint possesses resealability to obtain a joint possessing said properties without the necessity for replacing the lubricating and sealing ribbon.

Claim 3 provides:

A reusable threaded joint according to Claim 2 wherein the pitchliness of the threads are tapered and the female fitting is adapted to be turned farther onto the male fitting in successive uses of the joint and new portions of the ribbon are adapted to be presented for stretching and compression between the fittings in successive uses of the joint.

ing a smooth, white porous tape which is inert to most chemicals.[4] The tape is relatively flimsy, and can be torn easily by hand, yet can be stretched latitudinally as much as 100% without tearing. Tr. 17, 22. Due to the evaporation of the lubricant, the tape has a number of air voids or pores distributed throughout. Consequently, the tape has a specific gravity somewhat less than that of solid UPTFE, which is approximately 2.2.[5] Since prior to the alleged invention of the patent in suit, UPTFE tape manufactured according to this process has been sold for use in wrapping wire to form an insulating coating. After the wire is wrapped with the tape, it is heated to a temperature above the melting point of the UPTFE, thus sintering the UPTFE and creating a solid, nonporous insulating cover of sintered PTFE. Tr. 18.

The process of making the joint is deceptively simple. The UPTFE tape is wrapped around the threads of the male member of the joint prior to assembly. The female member is then threaded onto the male member and tightened in the usual manner. When the female pipe joint member is turned onto the male member, it compacts the UPTFE material into the threads of the joint, compressing the material by squeezing out the air left in the tape. The tape is compressed to a density approximately that of solid PTFE. Tr. 24–26. The formation of a reliably sealed pipe joint using the UPTFE tape is the result of the presence of tightly packed UPTFE completely surrounding at least one circumference of the threads. Pre-Trial Order, Admitted Facts, ¶ 11; Tr. 35.

4. Defendant employs an additional step of stretching and heating the tape following the first calendaring, which reduces the specific gravity of the tape but does not change its dimensions.

5. Tape made according to the process described in the specifications of the '770 patent has an average specific gravity in the range of 1.4–1.5.

6. Defendant evidently no longer contends that the patent is invalid because the invention was "known" in the sense of § 102(a) prior to Chesnut's and Singalewitch's date of conception. In

The claimed invention is a significant improvement over sealed threaded joints in the prior art. The tape is clean and easy to apply by hand, even at low temperatures, with virtually no waste. The joint may be sealed effectively at lower torques than are required using alternative methods. The tape itself is inert to most substances. The protective film formed by the tape resists corrosion and galling often experienced in galvanized iron threaded joints, and does not contaminate material carried through the pipe. The tape does not deteriorate due to age, cold or heat up to its sintering temperature of 320° C. Because of the low coefficient of friction of the PTFE and the compressibility of the tape, the joint may be easily opened and can be resealed by applying slightly more torque than was required for the initial seal. Tr. 39–41.

## II. INVENTORSHIP

█ Defendant's first defense is that of derivation: that the named inventors, Chesnut and Singalewitch, derived the idea for the invention from a third party.[6] According to defendant, Orrin G. Youngquist, an employee of E. I. du Pont de Nemours, first conceived the idea of using unsintered PTFE in tape form to seal threaded joints during the course of a meeting between sales representatives of du Pont and representatives of the Minnesota Mining and Manufacturing Co. ("3M"), in St. Paul, Minnesota in January, 1957. Youngquist allegedly subsequently disclosed the idea to Charles Carr, also of du Pont, in the spring of 1957. Carr in turn is alleged to have disclosed the idea to various employees of J & J, including James Chesnut, prior to

any event, such a defense is without support in the record. The knowledge or use required by § 102(a) is public knowledge of a complete and operative device. *Jones Knitting Corp. v. Morgan*, 361 F.2d 451 (3rd Cir. 1966); *Connecticut Valley Enterprises, Inc. v. U. S.*, 348 F.2d 949 (Ct.Cl.1965). The record discloses neither that the alleged disclosure to 3M made the invention publicly known nor that any one attempted to put the invention into practice at any time prior to Chesnut's and Singalewitch's conception.

March 19, 1958, which has been admitted to be the date of alleged conception of Chesnut and Singalewitch. Pre-Trial Order, Admitted Facts ¶ 43; Tr. 247, 249–253, 303, 444.

■ 35 U.S.C. § 102(f) provides that: "A person shall be entitled to a patent unless— . . .

(f) he did not himself invent the subject matter sought to be patented . . . ."

To establish the defense of derivation under § 102(f), the defendant must prove both that the invention was previously conceived by another person, and that the complete conception was communicated to the party charged with derivation. *Agawam Co. v. Jordan*, 7 Wall. 583, 74 U.S. 583, 19 L.Ed. 177 (1868); *Amax Fly Ash Corp. v. U. S.*, 514 F.2d 1041 (Ct.Cl.1975); *Hedgewick v. Akers*, 497 F.2d 905 (Cust. & Pat.App.1974); *Erie Technological Products v. Die Craft Products*, 318 F.Supp. 933 (N.D.Ill.1970), mod., 461 F.2d 5 (7th Cir. 1972). The presumption of validity set forth in 35 U.S.C. § 282 extends to the presumption that the inventors named in the patent are the true inventors. *Acme Highway Products Corp. v. D. S. Brown Co.*, 431 F.2d 1074 (6th Cir. 1970), *cert. denied*, 401 U.S. 956, 91 S.Ct. 977, 28 L.Ed.2d 239 (1971). One who seeks to show that a patent is invalid under 35 U.S.C. § 102(f) must establish each element of the defense by clear and convincing proof, especially when much of the evidence is oral testimony unsupported by contemporaneous documentary evidence. *Campbell v. Spectrum Automation Co.*, 513 F.2d 932 (6th Cir. 1975); *Amax Fly Ash Corp. v. U. S., supra*; *Heyman Manufacturing Co. v. Hap Corp.*, 131 U.S.P.Q. 165 (D.R.I.1961). All the circumstances in the record must be considered in evaluating the sufficiency of the defendant's proof. *Hedgewick v. Akers, supra*.

A. *Youngquist's Conception*

■ On or about January 25, 1957, Orrin Youngquist, William Franta, and Charles H. Concklin, du Pont employees involved in selling Teflon resins in the Midwest,[7] met with representatives of 3M [8] at the 3M offices in St. Paul, Minnesota. Tr. 216, 217 (Franta); 277–279 (Concklin); 435–436 (Youngquist). The independent testimony of Youngquist, Franta and Concklin is that during the course of the meeting, Youngquist suggested to the 3M personnel [9] that the UPTFE tape then being manufactured as electric wire insulation might be useful in sealing threaded joints. Tr. 434 (Youngquist); 217–218 (Franta); 276–279 (Concklin). Following the meeting in St. Paul, the "Youngquist idea" was not disseminated generally to other customers.[10] Tr. 243, 453. Youngquist did disclose the idea to Charles Carr, a du Pont salesman for Teflon products responsible for the Detroit region, on or about June 1957. Tr. 447, 471–472.[11]

---

7. At the time Youngquist was District Manager in charge of Teflon for the Chicago Sales Division of the du Pont Polychemicals Department; Franta was the Marketing Director of the fluorocarbons group of the Polychemicals Division, reporting to Youngquist; Concklin was a salesman of Teflon resins in the Chicago area, reporting to Franta.

8. 3M had been a customer of du Pont, purchasing a Teflon dispersion which was then coagulated and made into electrical insulation tape. Tr. 440–443.

9. The idea was allegedly disclosed to James A. Schedin, who was in the Market Development Group of the Electrical Products Division. Tr. 436; DX–9.

10. Youngquist testified that he believed he had discussed the idea with others in the du Pont organization in Wilmington, and that one or more persons may have tried an application of the tape, but he could recall no specific instances. Tr. 444. Franta also stated that he was sure he "would have talked about it" [the idea] among his colleagues at du Pont, but he has no specific recollection of disclosing the idea to anyone subsequent to the January, 1957 meeting. Tr. 243–244. The Court cannot find from that uncertain testimony that the idea was ever communicated to other employees of du Pont prior to the date of conception of Chesnut and Singalewitch.

11. Concklin testified that the idea was discussed at a sales meeting held in the Drake Hotel in Chicago in the spring of 1957, which Carr attended. Tr. 282–283. Carr and Youngquist both testified that the idea was disclosed to Carr in private sometime prior to

Plaintiff introduced no direct contradictory testimony in rebuttal to defendant's case. Plaintiff now urges the Court to discredit the testimony of defendant's witnesses on the basis of circumstantial evidence with respect to the subsequent behavior of the individuals involved, especially the failure of du Pont or 3M to implement the "Youngquist idea", and the failure of Youngquist to inform plaintiff's personnel of his prior conception. Plaintiff urges the Court to infer from that behavior that the subject discussed at the 3M meeting was not the use of the UPTFE tape, but the use of UPTFE dispersions for sealing threaded joints.

█ In view of all the circumstances presented in the record of this case, the Court cannot infer that the testimony of Youngquist, Franta and Concklin was unfounded or mistaken. Although the oral testimony of Youngquist, Franta and Concklin is uncorroborated by contemporaneous documentary evidence, it is sufficient to satisfy defendant's burden of proof with respect to conception by Youngquist of the idea of using UPTFE tape as a pipe thread sealant. The testimony of all three men was credible. They were disinterested witnesses; each recalled the circumstances of

the meeting independently.[12] The minor discrepancies between their testimony do not detract from their credibility since those discrepancies do not go to the material elements of their testimony.[13]

When the alleged disclosure of the idea is put into context, plaintiff's rebuttal arguments do not impeach the defense testimony. Youngquist, Franta and Concklin were all sales personnel with du Pont, concerned primarily with generating ideas for the use of Teflon in order to increase sales of Teflon resins, not with developing patentable inventions. As a general matter of corporate policy, du Pont had little interest in obtaining patents itself on end uses of Teflon, preferring to patent only the basic raw materials. Tr. 221, 479. In most cases, rather than experimenting with new ideas themselves, du Pont personnel would find an interested customer who was willing to develop the idea, and then would follow the customer's progress. Tr. 248, 285, 479. The Court, therefore, cannot infer from du Pont's failure to implement Youngquist's suggestion that no such suggestion was made, especially considering the volume of suggestions generated by the salesmen in various contacts with customers for Teflon resins.[14] Similarly, no such inference can

his leaving the Detroit area. Tr. 349–350, 447, 471–472.

**12.** Plaintiff urges that their testimony is suspect because they all read Carr's 1963 deposition and were irrevocably tainted by his version of the events. The Court is satisfied, after observing the witnesses, that they were not influenced by the Carr deposition to alter their testimony.

**13.** The discrepancies cited by plaintiff go primarily to when Youngquist thought of the idea. Youngquist and Franta testified that no mention of the idea was made prior to the meeting with Schedin. Tr. 216–218, 436–439, 443–444. Concklin, on the other hand, had a clear recollection that the idea was discussed during the plane trip to St. Paul and that a list of that and other ideas was made at that time. Tr. 276–277, 292. In addition, while Concklin testified that the purpose of the meeting was to submit suggestions for new uses of UPTFE tape (Tr. 276), Youngquist recalled no specific purpose for the meeting. Tr. 439.

As the events in question took place almost twenty years ago, the Court does not find that

those minor discrepancies detract from the credibility of the testimony of each witness.

**14.** The testimony of Dennis O'Flynn, a du Pont salesman, that he was surprised when he first heard of the tape sealant idea at the sales meeting in the summer of 1958 is not probative on the issue of whether Youngquist conceived the idea in 1957. There is no evidence from which the Court could infer that O'Flynn would necessarily have known of the Youngquist idea, if such an idea had been suggested prior to that meeting. At the time, O'Flynn was assigned to the sales force in New England. Tr. 905. There is testimony that new ideas were sometimes closely guarded by salesmen in order to enable good customers to develop a competitive advantage. Tr. 224, 462. Even accepting Youngquist's vague testimony with regard to discussions of the idea with employees in Wilmington at face value, (see, supra, n. 10), there is no evidence that the idea was widely known throughout the company. Furthermore, O'Flynn's testimony is undercut by his own admission that there were some conversations

be drawn from 3M's failure to experiment with the use of the tape as a pipe thread sealant. There could be numerous alternative reasons, such as reluctance to expand in a new market or failure to appreciate the commercial possibilities of the idea, which explain 3M's apparent lack of interest.

■ The fact that Youngquist did not mention his prior conception to plaintiff's personnel when he was on notice of the plan to market the tape and Chesnut's and Singalewitch's claims of inventorship [15] is not probative on the question of whether he in fact conceived the idea. Although the failure of an alleged inventor to make a claim of inventorship when other parties are being publicized as the true inventors is evidence which may permit the inference that the alleged inventor's assertions are not sustainable, *Honeywell, Inc. v. Sperry Rand Corp.*, 54 F.R.D. 593 (D.Minn.1973), the evidence as to Youngquist's behavior does not support such an inference.[16] It is consistent with his testimony that he did not inform anyone at Permacel that he had suggested the idea previous to Chesnut's conception, especially when it is considered that soon after the patent was issued, Youngquist did relate the entire story to Ryan, who could most logically be expected to act upon that information if needed. *See* n. 15, *supra.*

■ Having found that Youngquist did suggest the idea of using UPTFE tape to seal threaded joints during the 3M meeting in 1957, the Court must determine further whether that bare suggestion was a sufficient enabling disclosure to support the conception necessary for a defense of derivation. To establish derivation from a third party, that third party need not have reduced the invention to practice, but must have a clearly defined idea of the invention in all its essential attributes that is capable of being reduced to practice by the inventor or one skilled in the art. *Amax Fly Ash Corp. v. U. S., supra. See also, Hedgewick v. Akers, supra; Erie Technological Products v. Die Craft Products, supra.*

■ Youngquist testified that he, "asked or stated that I thought a good application for unsintered tape might be to wrap joints of pipes". Tr. 443–444. As was noted under similar facts in *Erie Technological Products v. Die Craft Products, supra,* the claimed apparatus is "simplicity itself in its breadth". It does not take extraordinary skill or ingenuity to determine that by "wrapping joints of pipes", Youngquist meant that the tape would be applied circumferentially around the male member, and the joint completed in the usual fashion. At the time, Franta understood Youngquist's idea to involve wrapping the unsintered tape around the male threads,

during that meeting to the effect that Youngquist had "something to do with the unsintered tape business". Tr. 907.

15. Youngquist, Franta and Concklin learned that Permacel, a division of J & J, was introducing a UPTFE tape pipe thread sealant to the market at a du Pont national sales meeting in Wilmington in the summer of 1958. Tr. 364–366, 480. At that meeting, apparently neither Youngquist, Franta or Concklin mentioned Youngquist's prior disclosure to 3M. Following issuance of the '770 patent to J & J in 1961, Youngquist did mention the circumstances of his prior disclosure to Dennis Ryan, a du Pont attorney responsible for keeping track of patents related to use of Teflon products, Tr. 455–457, 477, although he made no claim to Ryan of being the rightful inventor of the subject matter of the patent in suit. Tr. 478. Youngquist was present at a meeting on November 6, 1961 between representatives of Permacel and du Pont held to discuss the possibility of a joint

advertising program promoting the use of UPTFE tape pipe thread sealant. Tr. 404. Youngquist did not mention the subject of his prior disclosure to the Permacel employees at that meeting, or at any other time. Tr. 480.

16. Youngquist was a salesman, with no particular expertise in patent matters and with no interest in obtaining patents for himself. Youngquist testified that he has never made any claims that he is entitled to the thread sealant patent on the grounds of prior inventorship. Tr. 478. Although he was kept apprised of the Permacel marketing program for the thread seal tape, as part of his continuing sales responsibilities, he was not closely involved with the development of that program. There is no evidence that he had reason to suspect, prior to Carr's deposition in 1962, that his suggestion might have been communicated to Chesnut prior to Chesnut's alleged independent conception.

tearing it off, and then completing the joint. Tr. 218–219. The record amply supports the conclusion that any person with experience in sealing threaded joints with devices or materials of the prior art, would be able to implement the claimed invention on the basis of such a suggestion. *See, e. g.,* Tr. 199–201. On the basis of the above, the Court finds that defendant has met its burden of proof with respect to the first prong of its defense, the prior conception of the idea.

### B. Communication to Chesnut and Singalewitch

 The evidence with respect to the communication of the Youngquist idea to Chesnut or Singalewitch is far more equivocal than that advanced in support of the original conception by Youngquist, and falls well short of clear and convincing. Defendant relies on the oral testimony of Charles Carr, a du Pont salesman, and on DX–3, a memorandum sent by Carr to Youngquist in November, 1961, over four years after the events in question, which sets forth his version of the disclosure to Chesnut.[17]

Carr's oral testimony in that regard is uncorroborated by any contemporaneous documentation.

Youngquist and Carr both testified that Youngquist disclosed the idea of using UPTFE tape as a thread sealant to Carr, then a salesman of Teflon products assigned to the Detroit area, while Carr was in Detroit. Tr. 349–350, 380 (Carr); Tr. 447, 471–472 (Youngquist).[18] In January, 1958, Carr was reassigned to the New Jersey area, which encompassed Permacel's pilot plant in Milltown, and the Sales Division of Permacel in New Brunswick. Tr. 345. Carr visited the pilot plant installation and the main offices on a frequent, but not programmed basis. Tr. 357–358, 697–698, 703. Carr testified that he disclosed the Youngquist idea to personnel at Permacel, including James Chesnut, during the course of those visits sometime prior to March 19, 1958. Tr. 357–360.

Carr's testimony is contradictory and vague as to exactly when and whom at Permacel he first informed of the idea.[19]

---

17. Plaintiff objected to the admission of DX–3 on the grounds that it is hearsay, self-serving and non-contemporaneous with the events it describes. It was admitted provisionally during the trial. After consideration of the document, the Court concludes that it is hearsay which is not covered by any of the exceptions to the hearsay rule. Rules 801, 802, 803, Fed. Rules of Evidence. The only two exceptions which arguably might apply are recent fabrication and business records. Plaintiff has made no charge of recent fabrication, and has not relied on the document as a prior inconsistent statement. The memo was specially requested by Youngquist, and consequently cannot be considered a memorandum "kept in the course of a regularly conducted business activity [which], it was the regular practice of that business activity to make". Rule 803(6). The memorandum is not admitted, therefore, to prove the truth of the matter asserted therein.

Even if DX–3 were admitted for the truth of its contents, the Court would not rely on any statements contained therein. The memorandum is merely cumulative of the oral testimony given. Since it is not contemporaneous with the events described, and is obviously self-serving, it is immaterial to this Court's decision. As Carr's behavior subsequent to his alleged disclosure to Chesnut is at issue in this case, the memorandum may be admitted for the limited purpose of showing that Carr informed du Pont personnel of that alleged disclosure.

18. Carr's testimony is that, prior to leaving Detroit, he attempted to interest William Bullock, Manager of Permacel's office in suburban Detroit, in the idea. Tr. 351–354, 382. Youngquist recalled being informed of Carr's disclosure of the idea to Permacel in Detroit. Tr. 451–452. Bullock, who no longer works for Permacel, denied that he had been informed of the idea by Carr. Tr. 923–926. In any event, evidence of a disclosure to Bullock is not probative on the issue of whether the alleged invention was ever disclosed to Chesnut.

19. On direct examination, he testified that he talked about the idea first to George Fitzgerald, Vice-President of Sales, in January or February, 1958. Tr. 357–358. When confronted with his 1963 deposition testimony that he had spoken first to Ed Farrell, a Product Manager, he agreed that he did not recall any conversations with Permacel personnel between January and August, 1958, other than with Chesnut and Farrell. Tr. 399–400. His testimony with respect to his disclosure to Farrell has been contradicted by Farrell, who denied that Carr ever suggested to him the use of UPTFE tape as a pipe thread sealant. Farrell testified that the first time he ever heard of the idea was

More critically, Carr cannot specifically pinpoint the time of his alleged disclosure of the idea to Chesnut. His "best estimate" was February, 1958, but he admitted that it could just as well have been sometime in March. Tr. 394.

Plaintiff's version of Chesnut's and Singalewitch's alleged conception of the use of UPTFE tape as a pipe thread sealant differs significantly from that offered by Carr. According to Singalewitch, the idea of using the tape as a sealant for threaded pipe joints came to him and Chesnut [20] on the afternoon of March 19, 1958 when a maintenance man reported having had trouble stopping a leak in the threaded joint of one of the plant's steam lines. Tr. 697–698, 719, 742. Chesnut and Singalewitch suggested that he use some of the UPTFE tape available in the plant [21] to seal the joint in an effort to stop the leak. Tr. 697. The same day, Chesnut and Singalewitch had lunched with Carr at a restaurant outside of the pilot plant.[22] Tr. 700, 704–705. Singalewitch recalled that, during that lunch, Carr mentioned the use of Teflon "T–30" dispersions for sealing threaded joints. Tr. 719–720, 723, 735, 738.

The date of the alleged conception was established by reference to Singalewitch's notebook entry of March 19, 1958, which refers to the lunch with Chesnut and Carr:

". . .—Had lunch with JAC & Charles Carr; DuPont representative. Carr discussed application of 'filled' teflon tapes for mechanical application and use of new DuPont primer for forming cementable fused Teflon.—" DX–45.

Carr's dispersion suggestion was not mentioned in the notebook entry because Singalewitch did not think it was a viable product for Permacel. Tr. 720.

On June 24, 1958, Chesnut made the following entry in his notebook with respect to the conception of the idea:

"Discussed with Dr. Les Weidner the possibility of securing a patent on the use of Teflon film as a sealant and a lubricant in the connections of threaded pipe. This idea previously evolved during a conversation between Don Singalewitch, Charles Carr, DuPont Salesman, and the writer sometime in the spring, probably April of 1958. [March 19, 1958 according to Don Singalewitch's notes]. It is not remembered who actually suggested the Teflon film be tried for this application. It is remembered that Charlie Carr initiated the subject by referring to the use for 'Teflon' 30 dispersion. After the conversation the writer evaluated some joints the threads having been wrapped with unsintered Teflon. The material is excellent for the use—conforming, reducing friction, being solid so all is used, easy to apply, insoluble, not messy, uniform, time saving, reusable. The writer then shortly (a matter of less than one week) contacted Mr. Farrell and Mr. Anderson concerning the marketing of unsintered Teflon as a pipe thread sealant and lubricant. Other materials were also tested for this use such as Skived Teflon and polyethylene. Altho these materials could be used, they did not display all the advantages of non-sintered Teflon. Primarily, they were difficult to seal before threading the pipe. Saran would not display this disadvantage & might be o. k." DX–46.

It is Singalewitch's testimony that he understood the reference in the Chesnut entry to the effect that "it is not remembered who actually suggested that Teflon film be tried" to mean that Chesnut couldn't remember whether he or Singalewitch made the initial suggestion. Tr. 722.

when Chesnut came to his office and demonstrated the use of the tape for that purpose. Tr. 933–936.

20. At that time, Chesnut was the Manager of the Permacel Pilot Plant. Singalewitch, who has training as a chemical engineer, was Chesnut's assistant. Chesnut died in 1963.

21. The pilot plant manufactured quantities of the tape for sale as insulation for electrical wires.

22. Carr denied any specific recollection of the lunch in question. Tr. 391. He had no specific recollection of whether Singalewitch was present when he allegedly disclosed the idea to Chesnut. Tr. 390–391.

While the patent application covering the use of UPTFE tape as a thread sealant was being drafted by Charles Harris, a Permacel attorney, Chesnut and Singalewitch had several discussions regarding the question of inventorship. Singalewitch recalls that although they felt that Carr's dispersion suggestion may have started their thinking of PTFE generally, they concluded that they were the sole joint inventors of the patent joint. Tr. 735–738, 762, 797, 824–825. Singalewitch executed the application oath to that effect, in the belief that it was true. He testified that he would not have done so if he had thought Carr had suggested the idea, and that he was positive Carr had not done so. Tr. 750, 797.

In light of all the evidence, the Court finds that defendant has failed to show, by clear and convincing evidence, that the idea of using UPTFE tape as a pipe thread sealant was communicated to either James Chesnut or Joseph Singalewitch prior to March 19, 1958. Singalewitch's testimony was entirely credible. While the notebook entries are ambiguous, they are not inconsistent with Singalewitch's story.[23] The Chesnut entry, DX–46, corroborates Singalewitch's testimony in its most important feature—that Carr had discussed the use of Teflon dispersions as pipe sealants during the lunch. The Court has no reason to doubt that Chesnut and Singalewitch felt, at the time they signed their oath of inventorship, that they had conceived the idea independently.

Carr's testimony, on the other hand, is uncorroborated. No contemporary documentary evidence was produced in support of his story, although Carr followed the company practice of filing call reports on the substance of meetings with customers.[24] Tr. 295–297, 348–349. The testimony of Bullock and Farrell contradicted that of Carr as to whether he informed anyone at Permacel of the idea. Even if it is assumed that Carr suggested the use of UPTFE tape to Permacel personnel, Carr's testimony as to the time he made those suggestions is vague and far from clear and convincing evidence that the alleged disclosure was made prior to March 19, 1958. Since Carr made frequent trips to the Permacel installations throughout the spring and summer of 1958, and was deeply involved in the sales program for the tape, it is possible that he has confused discussions with Chesnut, Farrell and Fitzgerald about the tape which took place sometime after March 19th with his alleged recollection of an earlier meeting.

Further, Carr's subsequent behavior casts considerable doubt on the credibility of his testimony. Carr was intimately involved with the development and marketing of the tape sealant by Permacel, Tr. 357–359, 364–366, 398–399, and supposedly knew that he had given Chesnut the idea. Nevertheless, he never mentioned that disclosure to anyone at Permacel, despite ample opportunity to do so.[25]

**23.** The Court acknowledges that the language of the memorandum to the effect that "the idea evolved during a conversation between Don Singalewitch, Charles Carr, du Pont Salesman, and the writer sometime in the spring. . ." could reasonably be interpreted to mean that Carr participated in the conception of the idea. Considering the remainder of the record on this issue, however, that is not the necessary implication of the words.

**24.** Carr did produce a call report dated May 14, 1958 dealing with a call on Permacel less than two months after the March 19 lunch.

Defendant also urges that this call report, DX–5, supports Carr's story in that it reflects Permacel's request for certain technical advice relevant to pipe sealant tape. The Court finds that document, and the responses thereto (DX–6, 7) of limited relevance. The report makes no reference to any purpose for which the tape is to be used. Singalewitch has pointed out that it dealt with properties more desirable for tape used to insulate wires than for thread sealant tape. Tr. 793. In any event, the documents are not inconsistent with Singalewitch's testimony since they are dated later than March 19, 1958.

**25.** In particular, Carr drove Harris from New Brunswick, New Jersey, to Wilmington to attend the November 6, 1961 meeting between Permacel and du Pont representatives with regard to a possible joint advertising program or purchase of the patent by du Pont. Tr. 404–409, 833, 912, 915. Carr did not, at that time, assert that he had suggested the idea to Chesnut or Singalewitch despite his close association with development of the product.

Derivation from a third party cannot be established unless communication to the named inventors is proved. Defendant has not carried its burden of proof with respect to that communication, and consequently the defense of derivation is without merit.

### III. *OBVIOUSNESS*

As a second ground of invalidity and unenforceability, defendant argues that the invention claimed would be obvious over prior art to a person ordinarily skilled in the art. Under 35 U.S.C. § 103, an invention is not patentable, "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. . ."

While the ultimate test of patent validity is one of law, *Great A & P Tea Co. v. Supermarket Corp.,* 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950), resolution of the obviousness issue entails several basic factual inquiries, as outlined in the landmark case of *Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966):

> ". . . Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness,

these inquiries may have relevancy. . . ."

The Court is mindful of the admonition that ". . . the simplicity of an invention is not a necessary bar to a patent". *Eagle Iron Works v. McLanahan Corp.,* 429 F.2d 1375, 1382 (3rd Cir. 1970). *See also, Clopay Corp. v. Blessings Corp.,* 422 F.Supp. 1312 (D.Del.1976). After careful consideration of the factual inquiries mandated by *Graham v. John Deere, supra,* however, the Court concludes that the subject matter patented would have been obvious to one skilled in the art.

### A. *Scope and Content of Prior Art*

 In analyzing the obviousness question, the Court starts with the presumption that the patent is valid. The burden of demonstrating invalidity by clear and convincing proof rests on the party asserting it. 35 U.S.C. § 282; *Aluminum Co. of America v. Amerola Products Corp.,* 194 U.S.P.Q. 1 (3rd Cir. 1977); *Tokyo Shibaura Electric Co. Ltd. v. Zenith Radio Corp.,* 404 F.Supp. 547 (D.Del.1975), aff'd., 548 F.2d 88 (3rd Cir. 1977). When relevant prior art has not been considered by the Patent Office, however, the presumption of validity is weakened or overcome. *Aluminum Co. of America v. Amerola Products Corp., supra; Philips Electronic & Pharmaceutical Industries Corp. v. Thermal & Electronics Industries, Inc.,* 450 F.2d 1164, 1176 (3rd Cir. 1971). The determination of the degree by which the presumption is weakened rests on a balancing of the pertinence of the newly cited art against the pertinence of the art actually considered by the Patent Office. *Aluminum Co. of America v. Amerola Products Corp., supra. Tee-Pak, Inc. v. St. Regis Paper Co.,* 491 F.2d 1193, 1196 (6th Cir. 1974).

The Patent Examiner cited eight U.S. and two foreign patents during examina-

---

The fact that Carr reported his alleged disclosure in the December memo to Youngquist, DX–3, has limited relevance on the question of whether he suggested the idea to Chesnut. The document is obviously self-serving; it was written four years after the fact, when Carr's memory may have been influenced by his subsequently acquired knowledge of the commercial success of the idea, or his judgment influenced by a desire for self-aggrandizement.

tion of the application that matured into the '770 patent.[26] Of these, the Court finds the two Llewellyn patents Nos. 2,578,523 (DX–33), and 2,586,357 (DX–34), and the Couhig patent No. 1,875,708 (DX–29) to be pertinent. Defendant introduced several references not before the Patent Office, including two counterpart foreign patents corresponding to the same invention, seven publications and one physical exhibit. Of these, those which refer to the properties of PTFE used in various sealing applications are as relevant to the validity of the '770 patent as were the three patents listed above which were considered by the Patent Examiner. As that art was not submitted to the Patent Examiner, the presumption of validity is substantially vitiated. *Allegheny Drop Forge Co. v. Portec, Inc.*, 541 F.2d 383 (3rd Cir. 1976).

 The relevant prior art is that which one skilled in the art would reasonably be expected to look to in order to solve a problem in the art. *Tokyo Shibaura, supra; In re Grout*, 377 F.2d 1019 (Cust. & Pat.App.1957). The problem to be solved in the instant case is leaking threaded pipe joints. The crux of the problem is to find a way to seal the joint effectively. In attempting to resolve that problem, one skilled in the art would reasonably be expected to look first to devices, compositions and materials being used in sealing threaded joints, and second to devices, compositions and materials used in analogous sealing applications.[27]

---

**26.** The following patents were cited by the Patent Examiner:

| Patentee | Patent No. | Issue Date |
|---|---|---|
| Kennedy | 351,605 | October 26, 1886 |
| Couhig | 1,875,708 | January 28, 1930 |
| Flagg | 2,145,168 | January 24, 1939 |
| Goldberg, et al. | 2,319,124 | July 11, 1942 |
| Hoesel | 2,407,552 | September 10, 1946 |
| Llewellyn | 2,586,357 | June 30, 1950 |
| Llewellyn | 2,578,523 | June 30, 1950 |
| Gill | 2,823,724 | September 23, 1955 |

Also cited were following foreign patents: United Kingdom Patent 770,774 to Vero, issued June 14, 1954; and Austrian Patent 37,682 to Skribek, issued January 1, 1909.

### 1. Prior art sealants used with threaded joints.

U.S. Patent No. 1,875,708 to Couhig, which was revealed to the Patent Office, teaches making a threaded joint with a sealing substance in the form of a thin strip, sheet or ribbon of woven fabric which is impregnated with a composition of asphaltum, graphite, soap and a lubricating oil. DX–29, p. 2, col. 1. The strip of material is wrapped circumferentially around the threads of the male member:

> In using the preferred embodiment of my invention, I take a strip of impregnated fabric, cut it to a suitable length, and wind it snugly over the male threads, See Figure 1, and into the valleys thereof and then assemble the joints in the ordinary way.

DX–29, p. 2, col. 1; Tr. 602.

In making up the joint, the cloth tape disintegrates under the destruction shearing forces produced by the tightening of the threads, leaving a residue of liquid and fibrous material within the joint. Tr. 1052–1054. Some of that material may leak out into the joint and contaminate the substances carried in the pipe. Tr. 1054. Couhig teaches that one object of his invention is to provide a method and means for sealing threaded pipe joints without causing the joint to stick together, as where paste compositions are employed, enabling the joints to be unscrewed for repair or replacement with facility. DX–29, p. 1, col. II; Tr. 600–601.

The concept of winding a string-like material around the male threads before com-

---

**27.** The two counterpart foreign patent references cited by defendant at trial, Belgian Patent No. 517,055 and British Patent No. 757,487 to Kaschke disclose a plastic sleeve or tube of polyethylene or polyvinyl chloride positioned between the threads of a screw-type adjustable tuner for a radio or other adjustable device. DX–24, 25, 84, 85. The purpose of the Kaschke invention is to provide a smooth, elastic surface on which the crests of the thread can slide, but which creates a certain pressure on the threads to eliminate looseness or unintentional rotation. Since the patents disclose neither a pipe nor a threaded joint sealant application, they suggest nothing of value to the solution of the problem of creating a satisfactorily sealed

pleting the joint is also taught by the use of candlewicking, a soft cotton string used by plumbers prior to 1958 primarily for sealing problem joints. Tr. 197–198, 201–202, 208; DX–78. As was demonstrated at trial, the candlewicking is wrapped snugly around the threads of the male member, so that the material fits into the valleys of the threads. As the candlewicking is soft and weak, it tends to disintegrate within the threads after the female member is tightened onto the male threads.

Prior to the invention of the patent in suit, a commonly used method of sealing threaded joints was the application of certain pipe dopes or gunks, paste-like compositions which were applied to the male threads with a stick or brush before screwing the pipe members together. Those dopes or gunks which were commercially available, primarily white lead and red lead dopes, used a viscous liquid with some lubricating properties which contained finely divided solid materials such as graphite. Tr. 39–40, 89, 189–190, 459–460. The principal function of these gunks or dopes is to lubricate the threads to facilitate the high torques necessary to create a virtual metal to metal seal. The dopes are generally messy and unsatisfactory to use. As the joint is tightened, much of the dope is pushed out of the joint at both ends, resulting in waste and contamination of the pipe.

Another type of thread sealant pipe dope available in the prior art contained fine particles of unsintered PTFE in a thickened dispersion form. To make the dope, a commercially available UPTFE dispersion of UPTFE particles and water is thickened by dissolving a substance such as polyvinyl alcohol in the dispersion. In the process, some of the dispersion is mixed in a Waring Blender to fibrillate some of the fine particles in the dispersion. Tr. 569, 1075–1077. The dope is applied to the joint in the same manner as other liquid dopes.

Defendant's expert, Dr. Wilbert Gore, testified that the UPTFE dope functions differently from the conventional prior art dopes. Whereas the conventional dopes act primarily as a lubricant, much of the paste being squeezed out of the joint, Gore testified that the UPTFE dope forms a substantially continuous film around the threads during assembly of the joint by virtue of the shearing forces generated by the turning, closely fitting members. According to Dr. Gore, the shearing forces fibrillate some of the UPTFE particles, forming a sort of matrix which retains the unfibrillated particles, but which lets the liquid dispersing medium escape from the joint. A sufficient amount of UPTFE material is retained within the joint to form a sealing film. Tr. 569–570, 574, 613–614, 650–659, 664, 669–670. Dr. Gore's testimony was largely theoretical speculation based on his extensive knowledge of PTFE technology. He had not run tests or made up any joints using UPTFE dispersions to verify his hypothesis.

Plaintiff's expert, Dr. Cyrus Bemmels, testified that the UPTFE dispersion functions in the same manner as the conventional dopes, as a lubricating medium. He disputed Dr. Gore's theory that it is largely water and liquid dispersing medium that is expelled from the joint during assembly, not the UPTFE particles themselves. According to Dr. Bemmels, both liquid and particles are squeezed out of the ends of the joint as the joint is completed. Tr. 1019–1020. He testified, based on personal observation of joints he had made using the dispersion, that the material which oozes out of the ends of the joint is identical in appearance to the starting medium. Tr. 1022. Plaintiff introduced into evidence two of the joints which had been prepared by Dr. Bemmels.[28] The threads of

---

threaded pipe joint, and cannot be considered relevant art.

**28.** Defendant has objected to introduction into evidence of all of the testimony and exhibits relating to the tests performed by Dr. Bemmels using the UPTFE dispersion (Tr. 1024–1046;

PX–57, 58, 59) on the ground that the tests were conducted on an ex parte basis, without notice to the defendant. Tr. 1032–1033, 1046. The fact that expert tests are performed ex parte, without notice to the alleged infringer, is not grounds for exclusion, so long as the opposing party is afforded the opportunity to

the pipes contained a few film-like patches, but no continuous film could be observed around the threads. Tr. 1048–1052, 1096. Dr. Bemmels did not test those joints to see if an effective seal was obtained. In other tests, using the UPTFE dispersion, made to measure the torque necessary to seal dispersion joints, he was able to obtain a successful seal in four out of ten joints. Tr. 1033; PX–57.

Plaintiff contends that the UPTFE dispersions are, in fact, inferior to conventional pipe dopes in performance and results. Since the UPTFE dispersion is in a liquid form, it possesses the same disadvantages as the conventional dopes, such as messiness, difficulty of application, and waste. There is no evidence in the record, however, that the UPTFE dispersions are inferior to other dopes. Plaintiff has offered no evidence comparing the performance of the UPTFE dopes with that of conventional dopes. All of the tests performed by Dr. Bemmels using the UPTFE dispersion were directed towards comparing the performance of the UPTFE dispersion with that of the UPTFE tape. The only evidence in the record with respect to a comparison of the UPTFE dopes with conventional dopes are several publication references cited by de-

fendant, all of which teach that UPTFE dopes have distinct advantages over conventional pipe dopes, including corrosion resistance, prevention of galling, ease of assembly and disassembly (including partial takedown and retightening), lubricity and inertness. Two of the cited references teach that the UPTFE dispersion forms a film between the threads of the male and female members.[29]

## 2. Prior art sealants used in applications not involving threaded joints.

Other than the Teflon dispersions, solid UPTFE was known to have utility in certain sealing applications not involving threaded joints. U.S. Patent No. 2,578,523 to Llewellyn is directed to the manufacture of gaskets and shaft seals or packings made from UPTFE in the form of hard, tough, dense sheets. Although not heated above its sintering point, the material is rolled and pressed until it exhibits many of the properties of sintered PTFE, such as extreme toughness and densification. The patent teaches the advantages of a tight seal, resistance to corrosion and high temperatures, and lubricity. DX–33, p. 1, col. 1; p. 3, col. 5. An article in Plastics, January, 1958, entitled "Calendered PTFE Tape",[30] teaches

cross-examine the expert who performed the tests. 5 Wigmore Evidence § 1385 (Chadburn Rev. 1974); *Hopkins v. E. I. du Pont de Nemours & Co.*, 199 F.2d 930 (3rd Cir. 1952). Defendant fully cross-examined Dr. Bemmels on the method and results of his tests. Deficiencies cited by defendant with respect to the manner in which the tests were performed go to the weight of the evidence, not the admissibility, and have been duly noted by the Court.

**29.** In November, 1953, an article in Chemical Engineering, entitled "Teflon Dispersion Makes Dope for Pressure-Tight Pipe Joints" (DX–16, pp. 196–197) states, in pertinent part:
Pressure-tight seals in threaded pipe joints can be assembled with much less force than is ordinarily required by using a thickened dispersion of Teflon tetrafluoroethylene resin as a sealing compound. The low coefficient of friction of Teflon permits easy assembly of pipe joints, and the Teflon elastically compressed into the threads makes a tight seal. Galling of pipe threads is minimized, even with stainless steel and various kinds of plastic pipes. The Teflon is also heat stable and chemically inert.

DX–16, p. 196; Tr. 571–572.
An advertisement of the Eco Engineering Co. contained in Chemical Processing, March, 1954, (DX–18, p. 176), describes a Teflon-based thread sealing compound for sealing threaded joints exposed to hazardous and corrosive fluids and gases. The compound is taught to form a continuous film around the threads of the male member, which prevents leakage, allow the joints to be broken easily and eliminates galling and sheared threads during disassembly.
A third reference, an article entitled "T-Film", in the March, 1954 edition of the Journal of Materials and Methods, (DX–19, pp. 230–232), discloses the utility of using a UPTFE dispersion for sealing threaded joints. Among the advantages cited by the article are corrosion resistance, prevention of galling, ease of assembly and disassembly (including partial takedown and retightening), lubricity and inertness. The article states that the Teflon paste "forms a film between threads".

**30.** "Calendared PTFE Tape", Plastics, January, 1958, pages 31–32 (DX–22).

that the unsintered PTFE tape may be effective in certain sealing applications:

PTFE is, of course, now an established basic material in the manufacture of seals and gaskets and this also refers to engineering packings. For particular applications seals of spirally wound construction using unsintered tape to seal in a core are proving attractive. In the case of the braided type of packing, veneered tape alone or over asbestos holds the field at present but the unsintered type now appears to have advantages.[31]

DX–22, p. 32, col. 3; Tr. 591–592.

### 3. Prior art relating to unsintered PTFE tape.

Defendant has also cited references which deal specifically with the properties of the calendared UPTFE tape, outside of the context of sealing applications.[32] U.S. Patent No. 2,586,357 to Llewellyn, which was cited to the Patent Office, discloses a method of manufacturing an unsintered PTFE tape. The method disclosed is essentially the same as that described in the '770 patent specifications. There is no disclosure of the use of the tape in its unsintered form other than as an intermediary product. The examples contemplate that the tape will be sintered in its final form. DX–34. There is no specific disclosure of the use of the tape, in any form, in a sealing application.

The advantages of the use of the tape in its unsintered form are taught by the January, 1958, Plastics articles, DX–22, supra:

An advantage of calendered tape over veneered tape or cast film is that it comes from the calendaring process in the unsintered condition and although it may be

passed immediately through a sintering bath it is generally preferable to postpone this step until the tape has been applied to its final purpose. The particular merits of tape in this condition are that it is soft and pliable, lending itself to wrapping or shaping over irregular articles. DX–22, p. 32, col. 1; Tr. 590–591.

The article cites the following "outstanding combinations" of PTFE properties:

(a) unaffected by all known solvents and is completely inert to almost all acids, alkalies and other chemicals. (p. 32, col. 1);

(b) extremely low coefficient of friction. (p. 31, col. 1);

(c) low transverse tensile strength and high transverse elongation. (p. 32, col. 1); and

(d) could be fabricated in unsintered tape from in thicknesses of from 3 to 10 mils. (p. 32, col. 3).

The same article teaches the usefulness of the unsintered tape in certain gasketing, packing and sealing applications. See, supra, at

### B. Differences Between Prior Art and Claims at Issue

The prior art disclosed both the concept of sealing a threaded joint by wrapping the male threads with a ribbon or string before completion of the joint (Couhig patent, candlewicking), and the advantageous use of unsintered PTFE, in dispersion form, as a material for sealing threaded joints. Among the advantages cited in the prior art for the use of UPTFE dispersions are the following:

(a) provides ease of assembly and disassembly due to the high lubricity (low

---

31. The application referred to as "spirally wound construction using unsintered tape to seal in a core" refers to a circular core of conventional packing material, such as asbestos, wrapped with unsintered tape. The wrapped core is then used as gasket for various sealing or packing operations. Tr. 592. The braiding type of packing cores referred to are packing elements used under compression to seal revolving pump shafts. Tr. 593. In such applications, one function of the unsintered tape is to provide a slippery surface for the revolving pump shaft while maintaining the seal. Tr. 593.

32. This prior art may or may not be art which one skilled in the art of sealing threaded joints would reasonably be expected to look to for a solution to the problem solved by the instant invention. As is discussed infra, this is the crux of the obviousness problem. The cited art will be discussed at this point in the interest of clarity.

coefficient of friction) of the UPTFE material.

(b) eliminates mechanical galling and galvanic corrosion between male and female members of dissimilar materials.

(c) provides biological inertness of the Teflon sealing material.

(d) promotes integrity of the seal, even when joints are tightened or frequently disassembled.

The prior art also disclosed that the use of UPTFE in other sealing applications had certain advantages over the use of alternative materials, including inertness, heat stability, and lubricity. Prior to the date of the invention in question, the art with respect to the properties of UPTFE tape recognized the conformability of the tape to wrapping or shaping over irregular articles.

What the prior art did not disclose was the use of a coherent, compressible [33] ribbon of unsintered UPTFE for sealing threaded pipe joints, which sealing material remained substantially intact and coherent within the joint after the joint was completed, and permitted the joint to be completely opened and resealed without addition of more sealing material.

## C. Level of Skill

■ The pertinent art in the instant case comprises devices, compositions and materials used to seal threaded joints. In a field that diffuse, it is difficult to pinpoint a "substantial body of people who devote regular and substantial effort" to solving the type of problem solved by the alleged invention. *Erie Technological Products v. Die Craft Products, supra.* Almost anyone who has done ordinary home plumbing has faced the problem of fixing a leaking pipe joint. In determining the appropriate level of skill in the pertinent art, however, the Court must focus on the problem solver and not on the user of the solution. *Systematic Tool & Machine Co. v. Walter Kidde and Co., Inc.,* 555 F.2d 342 (3rd Cir., 1977) (mechanically skilled individual familiar with the design of food slicing devices); *Universal Athletic Sales Co. v. American Gym Rec. & Ath. Equipment Corp., Inc.,* 546 F.2d 530 (3rd Cir. 1976) (designer of body-training devices). In other words, one skilled in the art is a person who would reasonably be expected to come up with a solution to a given problem in the art.

■ The appropriate level of skill in the instant case is greater than that of a

---

**33.** Defendant argues strenuously that the UPTFE dopes are compressible, and that the use of the UPTFE dope in the threaded joint results in a film of compressed UPTFE similar to that resulting from the use of UPTFE tape. The basis of this argument is Dr. Gore's theory that the shear forces within the joint fibrillate some of the UPTFE particles, which then trap other particles but allow the liquid medium to flow out of the joint. Dr. Gore compared the resulting dispersion in the joint to a wet sponge, which is composed of a coherent matrix of solid material with water dispersed throughout. If the sponge is compressed, the solid material remains intact but the water escapes. Tr. 651.

While Dr. Gore's hypothesis has some logical appeal, the Court cannot conclude that the UPTFE dispersion is compressible. When the tape is used, the pressure of the tightening threads forces out the air contained in the tape, resulting in a smaller total volume, but the same amount by weight of solid material. Defendant would have the Court equate the escape of air from the tape with the escape of water from the dispersion. The Court cannot accept that contention. In the first place, there

is no compression of the total amount of material contained in the dispersion. Even assuming that Dr. Gore is correct, and primarily liquid is dispelled, the action is not equivalent to the compression of the tape. The total volume of the solid UPTFE material and the liquid agents, both inside and outside the joint, does not decrease. The only change is that less material is left in the joint. Secondly, defendant has offered no evidence in support of Dr. Gore's novel theory. No tests were run using the dispersion to determine whether, in fact, the material which flows out of the joint contains proportionally more liquid agent than the starting material. Dr. Bemmels has testified that both the starting and end product are identical in appearance. The existence of film-like patches on the exhibit prepared by Dr. Bemmels does not support the inference that Dr. Gore's theory is correct. Dr. Gore did not make up any dispersion joints on his own which could be tested to determine whether the patches were attributable to fibrillation, as Dr. Gore claims, or merely the result of the evaporation of excess water from dispersion that remained on the joint after it was tightened.

plumber, who has familiarity only with the method of application and use of various materials used to seal threaded joints. One skilled in the art would also have familiarity with the nature and method of manufacture of the various devices, compositions and materials used to seal thread joints. For example, employees in the production and research departments of companies which manufacture the various sealing devices, who are responsible for development and manufacture of the devices, would be considered skilled in the art. No extraordinary technical training or expertise is required, but the appropriate level of skill demands a familiarity with how the devices work, not just with their method of use.

### D. *Analysis*

■ The invention claimed by the '770 patent is a combination of elements which were old and well known prior to the date of filing of the application. If the combination produces an unexpected result different from the prior art, the invention may be patentable. *U.S. v. Adams,* 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966); *Eagle Iron Works v. McLanahan Corp., supra.* The validity of the patent must be scrutinized, however, "with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. . . . " *Great A & P Tea Co. v. Supermarket Corp.,* 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950); *Sakraida v. Ag Pro, Inc.,* 425 U.S. 273, 281, 96 S.Ct. 1532, 1537, 47 L.Ed.2d 784 (1976).

Although the threaded members of the joint function no differently than those of prior art, the UPTFE tape performs an entirely different function than prior art UPTFE tape. The only commercially known use of extruded UPTFE tape prior to the claimed invention was as an intermediary product used to insulate wire. In its final form, after being wrapped around the wire and heated, the tape formed a coherent, sintered mass, with properties qualitatively different from those of the original tape. In its unsintered form, the tape had no commercial application. Consequently,

the claimed invention is distinguishable from those found obvious in *Sakraida v. Ag Pro., supra,* and *Anderson's-Black Rock v. Pavement Co.,* 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969), where the inventions merely combined old elements, each of which performed the same function it had in the prior art.

■ That does not dispose of the obviousness problem. Although the inventors utilized a component which had previously been used only in another field, the Court must determine whether it would have been obvious to one skilled in the art to employ that component to solve the problem it solves in the alleged invention. *Continental Can Co., Inc. v. Old Dominion Box Co., Inc.,* 393 F.2d 321 (2d Cir. 1968). At some point, the bringing together of knowledge held in widely diverse fields itself becomes invention. *Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp.,* 372 F.2d 263, 268, n. 1 (2d Cir. 1967). The mere fact, however, that the invention combines references from diverse fields does not necessarily render the invention nonobvious. If the fields utilize such similar principles of design or function that an inventor would reasonably be expected to look to that field for a solution of the problem which the patent device attempted to solve, the invention may be obvious. *See, Tokyo Shibaura Electric Co., Ltd. v. Zenith Radio Corp., supra; Mott Corp. v. Sunflower Industries, Inc.,* 314 F.2d 872 (10th Cir. 1963); *Novelart Manufacturing Co. v. Carlin Container Corp.,* 363 F.Supp. 58 (D.N.J.1973); *In re Grout, supra.*

The essence of the claimed inventive contribution of Chesnut and Singalewitch lies in their joint recognition of the usefulness of UPTFE tape, which had previously been used only for a different purpose in an unrelated application, as a pipe sealant for threaded joints. The prior use of the tape as wire insulation bears very little relationship to its use as a threaded pipe joint sealant. Some of the properties which make the tape well suited for sealing threaded joints, such as compressibility, lubricity and self-adhesion, have little utility in insulating electrical wire, but are rather

inherent qualities of the tape attributable to the use of UPTFE as the primary material and to the method of manufacture. The question to be determined is whether solving the problem of leaking joints by drawing on knowledge of a material used only in an unrelated application constitutes invention under § 103, or is rather the result of the natural development of the art which would be obvious to one skilled in the art. *See, Amax Fly Ash Corp. v. U.S., supra.*

The Court finds that the teachings of the prior art would reasonably lead one skilled in the art to investigate different forms of UPTFE then available, including the UPTFE tape, for effectiveness in sealing threaded joints. The fact that the tape was currently being sold only for a non-analogous use is not persuasive on the issue of obviousness. The crucial link between the prior art and the claimed invention is the use of UPTFE as the sealing material. No teaching of the prior art indicated that UPTFE in tape form would not have utility as a threaded pipe joint sealant. The teachings rather would reasonably lead one skilled in the art towards the use of such tape.

The prior art teaches that UPTFE has certain inherent qualities which make it a superior material in sealing applications. In particular, the UPTFE pipe dopes demonstrate the effectiveness of an unsintered PTFE in the precise sealing application here. Other forms of UPTFE were shown to be effective in a range of analogous sealing applications. Although there is no evidence in the record that the tape was widely used for any purpose other than wire insulation prior to 1958, the Plastics reference (DX–22) teaches that it was known to have utility in sealing and packing operations, largely because of its flexibility and conformability. The demonstrated utility of UPTFE in sealing applications would have made it obvious to anyone skilled in the art to look to the field of UPTFE technology, and the multitude of applications and uses which had been devised for UPTFE, for a solution to the problem of leaking pipe joints. In view of the teachings in the Couhig patent and the experience of persons skilled in the art with devices such as candlewicking, one of the most likely candidates available as a solution to that particular problem would be the UPTFE in a tape form.[34]

A second inquiry remains. If one skilled in the art had looked to other UPTFE applications, including UPTFE tape, would it have been obvious that the tape would effectively seal a threaded joint? The Court finds that it would have been obvious to one skilled in the art. The inherent properties of UPTFE, such as lubricity and inertness, and its effectiveness in sealing and prevention of mechanical galling were known in the art. Plaintiff's expert, Dr. Bemmels, testified that the physical properties of the tape, such as its apparent flimsiness and weakness, would appear to be disadvantages to one skilled in the art, as one would expect that the tape would disintegrate under the destructive pressures created by the tightening of the joint. Tr. 32–33. The prior art teaches, however, that the tape has a high transverse elongation[35] when stretched. This is confirmed by a physical examination of the tape. Tr. 17, 22. One skilled in the art would perceive that this elongation feature would enable the tape to fit over the crests and into the valleys of the threads without substantial tearing. Even if one skilled in the art would have expected some disintegration of the tape within the joint, he would not expect that the disintegration would impair the effectiveness of the tape as a sealant. Couhig clearly teaches that the tape disintegrates within the joint, but that an effective seal may nevertheless be obtained. The UPTFE dopes likewise are affected by the stresses with the joint, which force much of the material out of the joint, yet leave enough within the joint to seal effectively.

---

34. The Court notes that, in fact, it was the use of UPTFE dispersions which led Chesnut and Singalewitch to try the UPTFE tape as a pipe thread sealant.

35. Plastics references, DX–22, p. 32, col. 1.

Plaintiff contends that the tape sealed joint would not be obvious as it coacts in a completely different fashion than the UPTFE dopes, by compressing the tape within the threads to completely pack one circumference of the pipe.[36] While the intentional use of UPTFE in a compressible form as a pipe thread sealant was not taught by the prior art, the Court still finds that the utility of the UPTFE tape as a threaded pipe sealant would have been obvious. Compressibility is an inherent feature of the tape. Even assuming that Chesnut and Singalewitch were the first to recognize the compressibility of the tape,[37] recognition of the inherent properties of a material does not constitute invention. *Armour Pharmaceutical Co. v. Richardson Merrell, Inc.,* 264 F.Supp. 1013 (D.Del.1967). As was found in *Gould National Batteries, Inc. v. Gulton Industries, Inc.,* 361 F.2d 912, 914 (3rd Cir. 1966), where the allegedly novel feature of the invention is a structural element substantially similar to one old in the art, the claim to patentability may not rest on the discovery of a new use to which such an element was readily accommodable by reason of its intrinsic properties. The advantageous use of the compressibility feature by Chesnut and Singalewitch in making a sealed joint could not be said to be surprising. It would have been obvious to anyone skilled in the art that a tape which could be tightly compressed into the threads of the joint would be efficacious in effecting a tight seal, since it would form a protective barrier within the threads to halt leakage of any substance from within the pipe.[38]

Finally, plaintiff cites a number of secondary considerations outlined in *Graham v. John Deere Co., supra,* such as commercial success, long-felt need and failure of others to come up with the same solution despite availability of all of the necessary materials. The problem of leaking threaded joints is a universal one, which has plagued industries and homes alike. Chesnut and Singalewitch were the first to test the utility of the UPTFE tape as a pipe thread sealant. It is virtually undisputed that the tape has enjoyed substantial commercial success as a pipe thread sealant. Tr. 990–992; PX–54, 55. Those considerations, however, are entitled to "only measured weight" in determining obviousness, and cannot by themselves support a finding of non-obviousness if it is otherwise established that a patent's disclosures are obvious in light of the prior art. *Aluminum Co. of America v. Amerola Products Corp., supra; Continental Can Co. v. Crown Cork & Seal Co.,* 415 F.2d 601, 602 (3rd Cir. 1969), *cert. denied,* 397 U.S. 914, 90 S.Ct. 916, 25 L.Ed.2d 94 (1970). Even if the primary considerations relating to the prior art were more equivocal, the Court does not find the evidence in the record with respect to the secondary considerations persuasive. Those considerations are most persuasive in cases such as *Clopay Corp. v. Blessings Corp., supra,* where a particular problem threatens to halt production entirely.[39] In the instant case, leaking pipe joints were a widespread problem of long-standing, but there is no evidence of any ongoing effort to solve the particular problem solved by the claimed

36. Defendant argues that the UPTFE dope functions in the same fashion as the tape. *See* n. 33, *supra.*

37. There is no evidence that Chesnut and Singalewitch were aware, when they conceived the idea, either that the tape was compressible, or that the compressibility was a critical feature of the invention.

38. One of the references cited by defendant, the Chemical Engineering article, DX–16, speaks of the Teflon in dope form being "elastically compressed into the threads". While the reference does not use the term "compressed" in the same sense it has been used by plaintiff (i.e., reduction in volume under pressure with no reduction in total weight of material), it does indicate that the principle of packing the threads to insure a good seal was well-known in the art.

39. The Court in that case found material the substantial evidence that others in the industry were making great efforts to rectify the problem by other methods, such as adjustment of the machine tension, etc., with no success. The relatively simple suggestion made by the inventor solved the problem where others had failed, as was evidenced by the substantial commercial success of the invention.

invention. No one group of people in any industry was focusing on developing a solution to the problem of leaking threaded joints. That the tape had never been used as a pipe threaded sealant prior to 1958,[40] therefore is of little weight in determining obviousness. *See, Aluminum Co. of America v. Amerola Products Corp., supra.* Other methods of sealing pipe, while inferior to the tape, were available and used extensively prior to development of the tape as a sealant by Permacel. The commercial success reflects the superiority of the tape over alternative methods, but is not evidence of its non-obviousness.

On the basis of the above, the Court finds the following: (1) It would have been obvious to one skilled in the art of sealing threaded pipe joints, as of 1958, to investigate other forms of UPTFE then being used in other applications, for possible utility as a pipe thread sealant. (2) It then would have been obvious to one skilled in the art that the UPTFE tape then being used for wire insulation would have utility as a pipe thread sealant.

## IV. *ANTICIPATION*

Third, defendant argues that the product claimed by the '770 patent lacks novelty under § 102, as it was substantially anticipated by the use of the UPTFE dispersions. To establish anticipation under § 102, defendant must show that a single prior art reference disclosed all the elements of the claimed invention, or their equivalents, functioning in essentially the same way:

> "Unless all of the same elements are found in exactly the same situation and united in the same way to perform the identical function" in a single prior art reference, "there is no anticipation." *Walker v. General Motors Corporation,* 362 F.2d 56, 58 (9th Cir. 1966).

*See, also, Shanklin v. Springfield Photo Count Co.,* 521 F.2d 609 (1st Cir. 1975); *Schroeder v. Owens-Corning Fiberglas*

*Corp.,* 514 F.2d 901 (9th Cir. 1975); *Universal Athletic Sales Co. v. American Gym, Recreational and Athletic Equipment Co., Inc., supra.* Defendant argues that the completed joint claimed by the '770 patent is substantially similar to the prior art joints made with UPTFE dispersion, and that therefore the patent in suit should be held invalid under § 102.

The claims of the '770 patent are product-by-process claims. The claims recite the method of forming the joint by wrapping a UPTFE ribbon circumferentially around the threads of the male fitting with the ends of the ribbon overlapped. The product claimed is the assembled pipe joint. For purposes of determining anticipation under § 102, only the structure of the claimed product, and not the process by which it was formed, may be considered. *In re Freeman,* 489 F.2d 742 (Cust. & Pat. App.1974); *In re Brown,* 459 F.2d 531, 59 CCPA 1036 (1972); *General Electric Co. v. Jewel Incandescent Lamp Co.,* 146 F.2d 414 (3rd Cir. 1944), *aff'd,* 326 U.S. 242, 66 S.Ct. 81, 90 L.Ed. 43 (1945). If a product-by-process claim describes a product that is the same as a prior art product, the claim is unpatentable even though the prior art product may have been made by a process different from that recited in the claims.

There are several significant differences between the product recited in the claims of the '770 patent claimed here and the joint made with a UPTFE dispersion. The dispersion is not a preformed, transversely stretchable, coherent, compressible ribbon which completely separates the surfaces of the pipe threads after the joint is assembled. Although Dr. Gore testified that the dispersion forms a continuous film within the joint, that conclusion is supported only by unverified publication references, not by any empirical evidence. As was pointed out with respect to obviousness, the evidence does not establish that the UPTFE dispersion functions in the same way within the threaded joint as does

---

**40.** The Court notes that, at least one other person, Orrin Youngquist, came up with the same idea as early as January, 1957.

the coherent tape. *See*, n. 33, *infra*. In addition, claims 2 and 3 of the patent in suit teach reusability of the joint after complete disassembly without addition of more material—an element not taught by the prior art UPTFE dispersions. Accordingly, the Court finds that the product of the '770 patent was not anticipated by the UPTFE dispersions used to seal threaded joints.

## V. *INFRINGEMENT*

Assuming *arguendo* that the '770 patent were valid and enforceable, the Court finds that defendant is infringing the claims of the patent. The defendant does not make, use or sell the patented joints, and therefore is not a direct infringer. Defendant can not dispute, however, that if there is direct infringement by purchasers of the tape, defendant would be guilty of actively inducing infringement under § 271(b) and contributory infringement under § 271(c).[41]

The issue, then, is whether the tape manufactured and sold by defendant[42] falls within the scope of the patent claims. The tape manufactured by defendant differs from the tape described in the specifications of the '770 patent primarily in the additional step of stretching the UPTFE material at an elevated temperature in the range of 300°C, following extrusion and calendaring. Tr. 537. This additional process reduces the specific gravity of the tape from approximately 1.45 to, typically, .9. Under extreme magnification, the resulting expanded tape exhibits substantially more fibrillation than does the extruded, higher density tape. Tr. 542–546; DX–12, 13. The expanded tape also demonstrates a higher coefficient of friction,[43] more self-adhesion,[44] and greater conformability to the threads of the joint.[45]

### A. *Literal Infringement*

■ Defendant contends that the expanded tape, with a specific gravity of .9, falls outside the density range specified in the claims of the '770 patent, and therefore

**41.** The conduct of Gore which constitutes active inducement of infringement is established by paragraphs 13 through 24 of the "Admitted Facts" set forth in the Pre-trial Order, which are evidence in this case, and PX–25, 26 and 27. Gore sells UPTFE tape to third parties for use in making threaded pipe joints and supplies instructions, on the packaging and advertising materials, as to how to make the patented joint. Gore has known of the patent in suit since 1963. Pre-Trial Order, Admitted Facts, paragraph 23.

Gore's activities in selling small rolls of UPTFE tape, such as PX–27, also would constitute contributory infringement because the tape is a component part of the patented joint "constituting a material part of the invention", and it was sold with the knowledge that it was especially made or especially adapted for use in an infringement of the patent, and it was "not a staple article or commodity of commerce suitable for substantial noninfringing use". 35 U.S.C. § 271(c); *Azoplate Corp. v. Silverlith, Inc.*, 367 F.Supp. 711 (D.Del.1973). The only other substantial use for narrow tapes of UPTFE is for wrapping electrical wire to make insulation. For that purpose, much larger rolls than those sold by defendant are required because otherwise it would be necessary to stop and rethread the high speed wire wrapping machines at frequent intervals. Tr. 111–112.

**42.** Gore has sold UPTFE tape for use in making threaded joints of three different density ranges as follows:

1. a density of about 1.5 to 1.6 (the tape sold to Hope Products, Inc. See Pre-Trial Order, Admitted Facts, paragraphs 13, 14 and 15; PX–15, 16 and 17).

2. a density of about 1.1 (See Pre-Trial Order, Admitted Facts, paragraph 22).

3. a density of about 0.9 (See Pre-Trial Order, Admitted Facts, paragraphs 22 and 27).

Most of the tape sold by Gore to concerns who were not licensed under the patent in suit had a nominal density of 0.9, and was sold as "Gore-Tex". All of this Gore-Tex material was sold after 1970. PX–14; Pre-Trial Order, Admitted Facts, paragraphs 16–22, 26, 27.

**43.** Dr. Gore found the coefficient of friction of the extruded tape, having a density of approximately 1.49, to be .29, and that of the expanded, .93 density tape, to be 1.34. Table 1, DX–14; Tr. 553.

**44.** The self-adhesion of the tape (i. e., the ability of the material to stick to itself) increases from .33 grams/sq. in. for the extruded tape to 1.75 grams/sq. in. for the expanded tape. Table 1, DX–14; Tr. 554.

**45.** The conformability of the tape to the threads is 12.6% for the extruded tape, and 29.2% for the expanded tape. Table 1, DX–14; Tr. 555.

does not literally infringe the patent.[46] To determine whether the expanded tape falls within the literal meaning of the patent claims, the Court must juxtapose the claims of the patent and the accused product within the overall context of the claims and specifications, to determine whether there is exact identity of all material elements. *Kreis A. G. v. American Hospital Supply Corp.*, 187 U.S.P.Q. 669 (W.D.Ill.1975); *Clopay Corp. v. Blessings Corp., supra; Johnson & Johnson v. W. L. Gore & Associates, Inc.*, 377 F.Supp. 1353 (D.Del.1974); *Kolene Corp. v. Motor City Metal Treating, Inc.*, 307 F.Supp. 1251 (E.D.Mich.1969), *aff'd*, 440 F.2d 77 (6th Cir. 1971), *cert. denied*, 404 U.S. 886, 92 S.Ct. 203, 30 L.Ed.2d 169 (1971). The answer depends on whether a person skilled in the art would read the claim of the patent to contemplate a range which includes the accused product. *Johnson & Johnson v. W. L. Gore & Associates, Inc., supra.*

The language of Claim 1 provides that the ribbon be "in the form of a flat coherent unsintered polytetrafluoroethylene film having a specific gravity *in the range of about 1.2–1.8* and being about 1 to 20 mils in thickness". (emphasis added). The numerical limitation on the specific gravity of the UPTFE tape is not absolute. In order to give the phrase "in the range of about 1.2–1.8" any meaning, the claims must be interpreted to read on some material with a specific gravity below 1.2. *See, Johnson & Johnson v. W. L. Gore & Associates, Inc., supra.* While the claim should not be unduly restricted by a narrow reading of the modifying language, however, the imprecision of the phrase does not render the limitation specified by a numerical range superfluous. *See, Arvin Industries, Inc. v. Berns Air King Corp.*, 525 F.2d 182 (7th Cir. 1975). The language of the court in *Borg-Warner Corp. v. Paragon Gear Works, Inc.*, 355 F.2d 400, 403–404 (1st Cir. 1965) in an analogous situation is particularly cogent:

It is true that different words and symbols are able to connote different degrees of generality. Here plaintiff has employed perhaps the most specific symbol, a number, and then broadened its meaning by the modifier "substantial." This is, of course, a useful and often necessary conjunction of words, but the modifier cannot be taken to negative entirely the specificity of the numeral it modifies. Rather, the phrase as a whole must be given a reasonable meaning. Plaintiff is correct that "substantially" and "approximately" cannot be read out of the patent. . . . But neither can the presence of these words render the specific numbers of no moment. (citations omitted).

Plaintiff's expert, Dr. Bemmels, considered a density of 0.8 to fall within the scope of the claims. Tr. 71–74, 84–86. He concluded that the only possible limitation on the density of the tape would be at a density so low that the tape becomes too weak to handle or would require an objectionable number of wraps. Tr. 71–74, 84–86. According to Dr. Bemmels, the claims cover all operable tapes. The patent itself does not disclose or suggest a lower limit for tapes that are operable. Dr. Bemmels' interpretation of the scope of the claims therefore would completely negate the numerical limit placed on the minimum specific gravity of the tape.

◼ The Court concludes, based on a reading of the specifications and claims in light of the skill of the art to which it pertains at the date of the application, *Raybestos-Manhattan, Inc. v. Texon, Inc.*, 268 F.2d 839 (1st Cir. 1959), that one skilled in the art would not interpret the language "in the range of about 1.2–1.8" to read on tape having a specific gravity of .9 or lower. Taken as a whole, Claim 1 would be most reasonably interpreted to describe the extruded, calendared tape available commercially in 1958 for wire insulation, and gener-

---

**46.** This issue was raised by defendant in a motion for partial summary judgment heard before the trial, which was denied on the ground that a substantial issue of fact re-mained as to how one skilled in the art would interpret the language of the claims. *Johnson & Johnson v. W. L. Gore & Associates, Inc.*, 377 F.Supp. 1353 (D.Del.1974).

ally having a specific gravity above 1.2.[47] The specification discloses only UPTFE tape formed by extrusion. It was known to be hypothetically possible to reduce the specific gravity of the extruded tape somewhat, by varying the amount of lubricant and the calendaring conditions.[48] Tr. 526–527, 771, 801, 1014–1016, there is no evidence that tapes with a specific gravity less than 1.0 were available in 1958.[49] Tr. 770–773. *See, e. g., Clopay Corp. v. Blessings Corp., supra.* One skilled in the art would therefore reasonably interpret the modifying language of the claims to provide for minor variations in the specific gravity of the extruded tapes resulting from irregularities or differences in the method of manufacture, but not to include PTFE tapes with a specific gravity of .9 or lower. *See, Arvin Industries, Inc. v. Berns Air King Corp., supra.*

### B. *Equivalents*

■■■ Under the doctrine of equivalents, a claim that is not literally infringed is nevertheless infringed by a device that performs substantially the same function in substantially the same way to obtain substantially the same result. *Graver Tank & Mfg. Co. v. Linde Air Products, Co.,* 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); *Kreis v. American Hospital Supply Corp., supra.* The infringing device must be substantially identical to the one alleged to be infringed in: (1) the result obtained; (2) the means of attaining that result; and (3) the manner in which the different parts

operate and cooperate to produce that result. *Farmhand, Inc. v. Craven,* 455 F.2d 609 (8th Cir. 1972).

■■ Pipe joints made with .9 density UPTFE tape are identical in every respect to those made with 1.4 density UPTFE or any other density within the range of the patent in suit. The material of the tape, pure UPTFE, is the same. The tape is applied to the threads in the same fashion. While there is a difference in the initial density of the tape, when the joint is completed the portions of the two tapes which form the seal are compressed to a maximum density of approximately 2.2 and are therefore completely indistinguishable.

Defendant cites several differences between the low density expanded tape and the higher density extruded tape which it claims make the two tapes not equivalent in performance. The Court finds those cited differences to be unsubstantial and immaterial.

Dr. Gore testified that, for all but a few special applications, an adequate seal can be obtained if a sufficient *volume* of PTFE material is present to fill at least one complete thread circumference; that is, that a given number of wraps of the lower density tape will seal as effectively as the same number of wraps of the higher density tape. Tr. 565–567. If this were true, the use of the lower density tape would result in a significant saving of unsintered PTFE material, since it takes less material per a given length to manufacture the expanded

47. The expanded tape was not developed until the late 1960s, Tr. 516, and did not become widely available until after 1970. PX–14; Pre-Trial Order, Admitted Facts, paragraphs 16–27.

48. Dr. Gore testified that, depending on the shape of the dispersion particles, the amount of lubricant used, and the degree of shearing, some variation in specific gravity is possible. It was his belief that the specific gravity could not be reduced much below 1.45, but could be increased up to 1.9. Tr. 526–528. Singalewitch testified that, by varying the extrusion and calendaring conditions, a variation of possibly 0.1 or slightly more might be possible. Tr. 771, 801.

Dr. Bemmels calculated that, by using the maximum amount of lubricant specified in the

Llewellyn '357 patent, a theoretical density of .065 could be obtained. Tr. 1015. Dr. Gore believed that a density that low could not be obtained, as most of the lubricant would be expelled during loading. Tr. 524, 619, 685.

Dr. Bemmels has found the actual density of the Permacel extruded tape to vary from 1.38 to 1.52. Tr. 110.

49. In early 1960, du Pont developed, on an experimental basis, a process which involved mixing finely ground salt with PTFE and subsequently extracting the salt, which produced unsintered and sintered PTFE products with specific gravities in the range of 1.0. Apparently the process was not adopted commercially. Tr. 527–528, 607.

tape. Tr. 626. The tests run by Dr. Bemmels indicated, however, that the critical factor is the *mass* of UPTFE material in the joint. PX–9. In order to obtain an effective seal, using both tapes, with the same amount of torque, Dr. Bemmels had to use equal weights of UPTFE material. He found three wraps of the expanded tape to approximate the weight of two wraps of the extruded tape.[50] Tr. 47, 64; PX–35. Joints containing less weight of UPTFE material did not seal as effectively at lower torques. Tr. 64–66; PX–9, 35, 36, 37.

The other advantages cited by defendant, such as high coefficient of friction, greater self-adhesion and better conformability to the male threads,[51] are of no practical significance. The ease of application of the tape to the joint is improved, only slightly, if at all. Dr. Bemmels testified that there is no substantial difference in the ease of application or performance of the two tapes, even at low temperatures. Tr. 48, 102. Mr. Hadley, a plumber who has used both the extruded and expanded tapes, testified that the expanded tape may be slightly easier to apply because it has a textured surface and therefore clings to the threads better when the tape is applied. Tr. 195–197.

▮ The fact that the expanded, lower density tape was unknown at the time of the application for the patent in suit does not render the doctrine of equivalents inapplicable. For infringement, the equivalent need not have been known at the time of the invention. *Diamond International Corp. v. Maryland Fresh Eggs, Inc.,* 374 F.Supp. 1223 (D.Md.1974). As this Court noted in its earlier decision on summary judgment:

> It is well established that an inventor is entitled to whatever merits his invention has, even though they may be greater than he supposed. *Johnson & Johnson v. W. L. Gore & Associates, Inc., supra;* 377 F.Supp. at 1355.

The Court finds, based on the identity of material, functioning and result, that the accused joints are equivalents of the patented joint.

## C. File Wrapper Estoppel

▮ Defendant asserts that a file wrapper estoppel precludes plaintiff from relying on the doctrine of equivalents. If a patentee narrows his claims in order to avoid a rejection based on prior art or indefiniteness, the claims cannot later be expanded, under the doctrine of equivalents, to cover elements of the original claims which were abandoned. *Trio Process Corp. v. L. Goldstein's Sons, Inc.,* 461 F.2d 661 (3rd Cir. 1972); *Borg-Warner Corp. v. Paragon Gear Works, Inc., supra.*

The language to the effect that the tape had a specific gravity "in the range of about 1.2–1.8" appeared in the original specifications and in Claims 2, 3, 5, and 6 of application serial number 767,116. Originally filed Claims 1 and 4 did not contain any numerical limitation on the specific gravity of the tape. On December 30, 1960, the Patent Examiner rejected all of the claims as unpatentable over Example 5 of the Llewellyn patent 2,578,523 (DX–33) and Austrian Patent No. 37,682 to Skribek. In response to this rejection, the claims were revised and those which omitted a specific gravity limitation were cancelled. The following argument was presented regarding Example 5 of the Llewellyn patent 2,578,-523:

> "This dense impenetrable, tremendously tough, thick skin is quite dissimilar to the lubricating and sealing ribbon of Applicants' which is described as being compressible and transversely stretchable and having a specific gravity in the range of about 1.2–1.8. In Applicants' film, the polytetrafluoroethylene particles cohere sufficiently to provide a ribbon which

---

**50.** In PX–9, an inter-office memorandum by employees of Gore, it was reported that test results indicated that two wraps of extruded tape gave as good results as three wraps of expanded tape. The memorandum concluded

that at least three wraps of .9 density tape is needed to seal a 1½″ fittings under 60 psi of water or at 500 psi of nitrogen.

**51.** *See,* n. 43, 44, 45, *infra.*

may be stretched over the male threads in a pipe joint without tearing, for example, but the particles are not coalesced as they would be in a sintered polytetrafluoroethylene film. In other words, Applicants' film is not densified. Applicants specify that the specific gravity of their film is in the range of about 1.2–1.8, normally about 1.6, as compared with about 2.2 for a similar sintered polytetrafluoroethylene film. The tough, thin skin of Example 5 of Llewellyn would have a density at least as high as that of sintered film and would not be within the range specified by Applicants."

(DX–48, page 58).

 It is clear from the file wrapper that only the upper limit of 1.8 was added to distinguish over Llewellyn. The lower limit of "about 1.2" was not added to distinguish over prior art. Dr. Bemmels has testified that, while he regarded the upper limit of density to be critical because high densities would restrict porosity, there was nothing critical about the lower limit. Tr. 72–74, 84–85. As discussed *supra*, the inclusion of the numerical limitation referred to the extruded tape then commercially available. The instant situation is similar to the one in *Kolene Corp. v. Motor City Metal Treating, Inc., supra,* in which the Court held that:

> The insertion of the phrase "between about 25% and 40%" which later came into the case was hence not dictated in attempting to distinguish over any earlier aerated cyanide-cyanate process but was inserted because substituted attorneys felt that it was improper under United States patent practice not to clearly define an operative process, stating an operative range, rather than merely describing the naked concept of adding aeration to some (or any) cyanide-cyanate

baths. As we have seen, there was an approximate lower limit, for chemical reasons, of 25% cyanate, and an approximate upper limit, for commercial reasons, of 40% cyanate. Thus, there was no giving up of any operative claim and the substitution therefor of another. . .

> The Court, therefore, concludes and finds that the cancellation of the original, non-operative, no-range claims, when viewed in context, was not caused by a need to avoid any area of prior art which plaintiff here seeks to recapture . . . .

> Plaintiff is not here asking the Court to add an unclaimed element, which was once claimed and then abandoned in order to save the claim from invalidity due to the prior art, or to drop from the claim some limitation originally added to distinguish the claim from the prior art cited by the Patent Office.

307 F.Supp. 1251, 1260.

The Court finds, therefore, that plaintiff is not estopped from expanding the literal coverage of its claims by resort to the doctrine of equivalents. Therefore, if this Court had found that the '770 patent were valid and enforceable, defendant would be guilty of both actively inducing infringement and contributory infringement under § 271.

## VI. *FRAUD AND BAD FAITH*

 As the Court has found that the disclosures of the '770 patent were obvious in light of, *inter alia,* the prior art of UPTFE dispersions used to seal threaded joints, defendant's claim of fraud in failing to reveal those dopes to the Patent Office must be considered.[52] It does not necessarily follow that plaintiff's failure to reveal certain prior art to the Patent Examiner constituted fraud on the Patent Office. *Tokyo Shibaura Electric Co., Ltd. v. Zenith Radio Corp.,* 404 F.Supp. 547 (D.Del.1975),

---

**52.** Defendant's claim of fraud with respect to the issue of inventorship has little merit in view of this Court's finding that the evidence does not establish derivation.

Defendant has also argued that plaintiff's representation that no prior art joint operates or functions with the same results as does the tape-sealed joint was a deliberate misrepresentation, as plaintiff's attorney knew that threaded pipe joints could be effectively sealed with UPTFE pastes. As discussed *supra*, the prior art UPTFE dopes did not anticipate the UPTFE tape in its method of functioning and the quality of the results obtained. Consequently, plaintiff's representation cannot be said to be false or misleading.

*aff'd.*, on other grounds, 548 F.2d 88 (3rd Cir. 1977); *Scott Paper Co. v. Fort Howard Paper Co.*, 432 F.2d 1198 (7th Cir. 1970). One making such a claim has the burden of clearly demonstrating not only objective "materiality" or "relevance" but also "an element of willful, wrongful conduct or wrongful intent". *In re Frost Patent Litigation*, 398 F.Supp. 1353, 1366 (D.Del.1975), *aff'd.*, in part and *rev'd.*, in part, 540 F.2d 601 (3rd Cir. 1976). The applicant should be accorded the right to exercise good faith judgment. Only when he is guilty of fraud, wilfulness or recklessness indicating a disregard for his duty of candor should enforcement of the patent be barred. *Xerox Corp. v. Dennison Mfg. Co.*, 322 F.Supp. 963, 968–969 (S.D.N.Y.1971). As Judge Stapleton expressed in *Tokyo Shibaura, supra*:

> A patent attorney has no absolute duty to perceive that which one skilled in the art would have perceived if left in a room to study a display of all the prior art. His duty is one of candor and this duty leaves room for the exercise of good faith judgment even if that judgment ultimately is held to have been faulty. 404 F.Supp. at 569.

**53.** There is dispute as to whether Harris knew at the time that the dispersion contained unsintered, as opposed to sintered, PTFE particles. Tr. 850–851. He was aware that the dispersion contained "Teflon" material. Tr. 848–849.

**54.** Harris concluded that the use of dispersion pipe dopes containing PTFE irrelevant to a consideration of the patentability of the invention, based on his belief that the dope does not form a continuous coherent film between the male and female fittings. DX–60; Tr. 848–850, 859–860. He further believed that the dopes containing PTFE in some form to be no more relevant than other prior art dopes used to seal threaded joints. Tr. 849–850.

The original application serial no. 767,116 prepared by Harris contains a brief introductory description of prior art materials and methods for sealing threaded pipe joints, including "pasty viscous or semi-liquid material(s)". DX–49, p. 1. That reference was deleted from the continuation-in-part application, but the Chesnut affidavit filed in that CIP application stated that: "Our maintenance workers had already tried other materials, including conventional liquid pipe dope with and without string, pieces of rag, etc. . . . ." DX–48, p. 87.

Charles Harris, the Permacel attorney solely responsible for the '770 patent application, was aware of and considered pipe dopes containing PTFE particles[53] at the time of the prosecution of the patent. DX–60; Tr. 848. He was not specifically aware of the existence of the journal articles cited by defendant until after the October 3, 1961 issue date of the '770 patent. Plaintiff's Answer to Defendant's Interrogatory No. 22. The Court is not convinced that the failure to cite those dopes to the Examiner was the result of anything more than a good faith judgment that the dopes were not as relevant as that art already considered by the Examiner.[54] Nor can the Court characterize Harris' failure to call to the attention of the Examiner references concerning PTFE pipe dopes which were cited in foreign applications[55] as gross negligence. The Court notes that:

> The advocate's mind is quick to fasten on a distinction . . . , often forgetting or avoiding inquiry into whether that distinction makes a significant difference. *In re Multidistrict Litigation Involving Frost Patent*, 540 F.2d 601, 609 (3rd Cir. 1976).

**55.** There is evidence that members of the Permacle legal department received notification that a du Pont "Teflon" manual was cited by the Swedish Patent Office against the foreign counterpart of the '770 application. DX–66; Tr. 881–882. That reference, which was eventually located by the Permacel librarian, pursuant to the request of Mr. Kish, another Permacel attorney, is apparently the same as DX–17, which cites the Chemical Engineering Article DX–16 in the bibliography. Mr. Harris does not recall that the Teflon reference was ever called to his attention, despite the existence within Permacel of a procedure to bring foreign references to attention of the attorney handling the U.S. case. Tr. 885–887. The Court cannot conclude that the failure to follow up on the bibliographical reference to the Chemical Engineering article was gross negligence.

Harris did recall that he was aware that Belgian Patent No. 517,055 to Kaschke (DX–84; *see* n. 24, *supra* ), was cited during the prosecution of one of the foreign counterpart applications. Tr. 890–891. As the Court has found Kaschke irrelevant to the patentability of the '770 invention, Harris cannot be faulted for failing to bring that reference to the attention of the Patent Office.

Even though the attorney may be guilty of faulty judgment, it is not fraud or gross negligence if the failure to reveal prior art is the result of a bona fide, good faith judgment as to the relevancy of that art. Accordingly, the Court finds, "under the 'totality of the circumstances'", *Monsanto Co. v. Rohm & Haas Co.*, 456 F.2d 592 (3rd Cir. 1972), that the prosecution of the '770 patent was not tainted by fraud or inequitable conduct.

▮ Implicit in the above holding is a finding that plaintiff is not guilty of any bad faith in attempting to enforce the '770 patent. As long as plaintiff or plaintiff's attorney could reasonably maintain a bona fide good faith belief in the validity of the patent, the attempt to enforce it through the courts was justified. On the basis of the record in this case, the Court cannot say that plaintiff should have known, prior to the trial of this case, that the '770 patent was invalid. *See, W. L. Gore & Associates, Inc. v. Oak Materials Group, Inc.*, 424 F.Supp. 700 (D.Del.1976).

## VII. *LACHES & ESTOPPEL*

▮ Finally, the Court finds no merit to defendant's allegation that plaintiff is barred from enforcing the '770 patent on the grounds of laches and estoppel. The determination of whether those equitable principles should be applied in any given case is addressed to the sound discretion of the trial judge, based on the equities of the individual situation. *Siemans A. G. v. Beltone Electronics Corp.*, 381 F.Supp. 57 (N.D. Ill.1974). The rule in the Third Circuit is that the one charging laches or estoppel has the burden of proof.[56] *Minnesota Mining and Manufacturing Co. v. Berwick Industries, Inc.*, 373 F.Supp. 851 (M.D.Pa.1974), aff'd., 532 F.2d 330 (3rd Cir. 1976); *Jenn-Air Corp. v. Penn Ventilator Corp.*, 464 F.2d 48 (3rd Cir. 1972).

The one factor common to those decisions in which laches or estoppel was found is that plaintiff knew of defendant's infringing activities and remained silent while defendant expanded its business. *Minnesota Mining & Manufacturing Co. v. Berwick Industries, Inc.*, supra; *Jenn-Air Corp. v. Penn Ventilator Corp.*, supra; *Baker Manufacturing Co. v. Whitewater Manufacturing Co.*, supra; *Continental Coatings Corp. v. Metco, Inc.*, supra. Most of the laches cases involve unreasonable delays of six years or more in commencing suit after plaintiff learned of defendant's infringing activities. *Seimans A. G. v. Beltone Electronics Corp.*, supra.

▮ Although there were some licensing negotiations between Johnson & Johnson and Gore in 1965 and 1966,[57] those negotiations were not sufficient to put J & J on notice that Gore was infringing the '770 patent. At most, the communications indicated that Gore was contemplating entering the tape pipe sealant market at some date. After license negotiations broke down in 1966, J & J had no reason to believe that Gore was making any sales to concerns not licensed under the '770 patent.[58] Harris was assured by John Crowe, Manager of Special Products at Gore, that Gore would be selling only to J & J licensees. Tr. 899. In fact, sales of UPTFE tape for use as a pipe thread sealant were minimal prior to

---

**56.** Some other courts espouse the rule that, with respect to laches, a delay of six years from the time the patentee learns of the infringement shifts the burden to the patentee to establish an excuse for failing to institute suit. *See, e. g., Baker Manufacturing Co. v. Whitewater Manufacturing Co.*, 430 F.2d 1008 (7th Cir. 1970), *cert. denied*, 401 U.S. 956, 91 S.Ct. 978, 28 L.Ed.2d 240 (1971); *Continental Coating Corp. v. Metco, Inc.*, 464 F.2d 1375 (7th Cir. 1972). Even if that rule were applicable in the Third Circuit, the Court holds that the evidence does not support a finding of laches.

**57.** *See*, PX–18 (same as DX–71); PX–19, PX–20 (same as DX–72); PX–22, DX–73.

**58.** J & J required only that either the manufacturer of the tape or the user of the tape pay a royalty. Therefore, Gore would not be infringing by selling tape to concerns already licensed under the '770 patent, who paid royalties on tape used in sealing threaded joints.

1961.[59] When J & J learned of Gore's plans to begin to market the expended tape widely, it acted promptly to inform Gore of its infringing activities and to institute discussions with defendant with respect to its manufacture of the tape.[60] The present suit was filed on February 24, 1972. Accordingly, plaintiff is not barred from enforcing the '770 patent against Gore on the grounds of unreasonable delay in commencing suit.

■■■■■■ To establish estoppel, defendant must demonstrate further that plaintiff made representations from which defendant could reasonably infer that the patent would not be enforced. *Menedez v. Holt*, 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526 (1888); *Minnesota Mining & Manufacturing Co. v. Berwick Industries, Inc., supra.* Defendant argues that the refusal of J & J to include a clause requiring the patentee to prosecute infringers is an affirmative action tending to deceive Gore into thinking the patent would not be enforced. The Court does not find that any such inference is reasonable. As Crowe acknowledged in his letter of September 17, 1965, to Harris, there are many arguments against a patentee's committing himself to enforce the patent against all infringers, regardless of expense. PX–19, ¶ 4. The mere refusal to include an enforcement clause in a license does not necessarily mean, therefore, that the patent would not be enforced at all. Accordingly, any reliance by defendant on that action of plaintiff is unreasonable.[61] The Court finds no estoppel.

## VIII. *SUMMARY*

For the reasons given above, the Court concludes that Claims 1, 2 and 3 of the '770

patent are infringed, and that plaintiff is not barred from enforcing the patent by reason of fraud, bad faith, laches or estoppel. The Court finds, however, that Claims 1, 2 and 3 are invalid for obviousness. A judgment will be entered declaring the invalidity of the patent. No attorneys' fees will be awarded.

Submit order.

---

59. Both parties have admitted that:

"Gore sold very little UPTFE tape for use in making threaded pipe joints prior to 1971 to concerns that were not licensed under the patent in suit". Pre-Trial Order, Admitted Facts, paragraph 26.

The only evidence in the record with respect to sales by Gore to non-licensees is PX–15, 16 and 17, which reflect a total sale of pipe thread tape to Hope Products in the amount of $2149.56 in 1966–67.

60. In a letter dated June 26, 1970, Harris informed Gore that J & J had received information that Gore was "at long last about to introduce and promote an unsintered PTFE product for use in making such joints." PX–23 (same as DX–74). Harris also met with Gore sometime in the fall of 1971 to discuss the situation. Tr. 902.

61. Although defendant has argued that its expansion of business prior to 1972 constitutes detrimental reliance, there is no evidence in the record with respect to the claimed expansion.